**STATE MOTOR PARTS CO., Inc., a Corporation, Plaintiff,**

v.

**CHRISTOPHER CONSTRUCTION CO., a Corporation, and the Buckeye Union Casualty Company, a Corporation, Defendants.**

**Civ. A. No. 673–F.**

United States District Court
N. D. West Virginia,
at Fairmont.

Jan. 4, 1963.

468

Steptoe & Johnson, Oscar J. Andre and Herbert G. Underwood, Clarksburg, W. Va., for plaintiff.

Donald R. Wilson and C. R. Nutter, Clarksburg, W. Va., for defendants.

HARRY E. WATKINS, Chief Judge.

Plaintiff, State Motor Parts Co. instituted this action to recover damages to property owned by it, alleged to have resulted from blasting operations of defendant, Christopher Construction Co., in the City of Clarksburg, West Virginia. The Buckeye Union Casualty Company is made a party defendant because it is surety on a performance bond for Christopher, conditioned, among other things, to satisfy claims for damages to persons or property in the performance of the work by Christopher. By stipulation at the beginning of the trial, it was agreed that Buckeye was not subject to liability independent of Christopher, that it will be liable only if Christopher was liable, and then only for the same amount. The case was tried to the court without a jury.

At a pretrial conference, it was agreed that the "issues" for decision were as follows:

"1. Did the plaintiff's property sustain damages which were proximately caused or proximately resulted from explosions set off by the defendant, Christopher Construction Co.?

"2. If so, what amount is the plaintiff entitled to recover for damages to its property proximately resulting from such explosions?"

During the summer and fall of 1960 Christopher was engaged in laying a sanitary sewer system for the City of Clarksburg, along the north bank of the West Fork River, near plaintiff's property. The work was done pursuant to a contract between Christopher and the City of Clarksburg. The work consisted of excavation for an 18-inch sewer line into the riverbed, followed by the laying of the line. The bed of the river is solid rock and the excavation into it was from

8 to 10 feet in depth. This was done by blasting in the riverbed near the northern bank, opposite plaintiff's property.

The work progressed from a point west of and opposite plaintiff's property; then directly across from the property (about 75 feet away) and beyond it. After passing under the Stealey Bridge, it crossed to the south side of the river; that is, the same side as plaintiff's property, and continued upstream. In addition to the main sewer line, there was a connecting line laid from the main line directly across the river to plaintiff's property. This required blasting to a point within 10 feet of the base of the wall supporting the main building owned by plaintiff.

To make this excavation, holes were drilled into the rock, explosives placed in the holes, and the blast fired. The purpose of the blasting was to fracture the solid rock so as to permit removal of the rock up to a depth of 8 to 10 feet. The explosive used was dynamite in sticks 2 inches in diameter, 24 inches long, and weighing 4 pounds. The number of sticks of dynamite placed in each hole depended upon the circumstances, and was left by Christopher to the discretion of the blasting crew. The number of blasts varied from day to day. On some days there was no blasting, while on other days there were several blasts.

Plaintiff, State Motor Parts Co. is a small corporation under the active management of Newton M. Callaham. He and his wife own all of its stock. At the time of the alleged damages plaintiff was and had for sometime prior thereto been engaged in the business of selling repair parts for motor vehicles and in the repair of motors and machinery. Its property and place of business fronts on Milford Street in the City of Clarksburg, just south of and adjacent to the Stealey Bridge across the West Fork River. It lies between the West Fork River and Hart Street, the south river bank being its northern boundary, and it extends along the southern bank of the river.

Two of its buildings are involved in this case. The main building fronts on Milford Street and extends back along the south bank of the river. It is constructed of poured concrete, concrete blocks, bricks, and a small amount of wood, and consists of two floors. The upper floor is on the level with Milford Street and is the sales floor, containing part of the merchandise and offices. The lower floor, which is used as a machine shop for the repair of motors and other machinery and for the storing of bulky parts, is below the upper floor but it extends beyond the upper floor at both front and back, being of the same width, but much longer than the upper floor. The ceiling of the lower floor at the ends, which project beyond the upper floor, is formed of poured concrete slabs made water-tight by caulking. Both decks are used to park automobiles. The rear or west wall of the lower floor is constructed of cement blocks fastened together with mortar. Near the center of this wall, there is a large doorway through which cars and trucks can be driven from Hart Street onto an asphalt-parking area, then down a steep driveway a short distance back of a retaining wall.

The second building is to the rear of the first and about 80 feet from it. The second building is made of metal of a prefabricated type, built on a concrete slab which is tied to the retaining wall at the river end of the slab.

There is a concrete wall extending from Milford Street along the south bank of the river past the metal building. This wall is a part of plaintiff's property and serves as the northern foundation of both the main and metal buildings and also serves as a flood wall. On February 20, 1961, after the blasting complained of, a portion of this wall collapsed into the river, and it constitutes the major item of damage involved in this case. Plaintiff claims that the collapse of this wall was proximately caused by the blasting of Christopher.

Immediately behind the wall, there was a fill, covered with asphalt, upon which

automobiles could be driven. The fill slopes from the wall toward the driveway, which gives access from Hart Street, and at the bottom of the slope there is a drain through which water falling on the surface of the asphalt drains into a storm sewer. When the wall collapsed part of the fill behind followed the wall into the river.

Dr. F. K. McClure, a veterinarian, erected the main building in 1929, enlarged it between 1930 and 1935 for use as an animal hospital, and it was then that the first part of the wall, 100 feet in length, was erected. That wall extends from Milford Street downstream along the river and serves as the northern foundation of the main building. The remainder of the wall was constructed in 1948 according to the same plans. The main building as it is today was completed in 1948, utilizing some parts of the older buildings, but the lower floor which was to be used as an automobile repair shop was constructed new in 1948.

Plaintiff leased the premises from McClure in 1954 at a rental of $500.00 per month, until 1957 when plaintiff purchased the premises. While renting from McClure, plaintiff erected the metal building at its own expense. The purchase price was $80,300.00. At first, plaintiff was in the automobile sales business and the transition into an automobile parts business in 1959 and the spring of 1960 required many internal changes, including the addition of partitions and storage bins. Machinery of various types was installed in the lower floor, and the entire inside of the building was cleaned and painted.

Persons working on plaintiff's premises in the latter part of July, and early August, 1960, felt tremor on plaintiff's premises as the work progressed up the river closer to plaintiff's premises. During that period some cracking of the asphalt covering the fill between the main and metal building was observed. A crack was observed in the black top about 40 feet long. But it was not until August 24, 1960, that plaintiff's premises were substantially damaged. In the early afternoon of that day, a heavy blast occurred which was much more severe than any previous blast. The severity of the blast was described by many witnesses, including employees of plaintiff, individuals working or residing in the vicinity, whose property was also damaged, and also employees of defendant Christopher, who set off the blast. Strong vibrations were felt in plaintiff's main building, and almost simultaneously with the blast, two employees in the building observed the cracking of the west wall of the lower floor, that which is constructed of concrete blocks, even to the extent of seeing daylight between the blocks. Immediately after the blast a fracture of the retaining wall, which had not previously existed, was found in the wall between the main and metal buildings. The concussion knocked a heavy hammer and some other tools from an anvil in the lower floor and also knocked some tools from a tool board on the upper floor. After August 24, the crack in the asphalt widened and the asphalt later dropped about one inch at one point. On the interior of the upper level there was moisture evident and plaster cracks. Shortly after the blast of August 24, an inspection of the retaining wall disclosed a fresh crack in the grouting at the first pilaster. At that pilaster, where a previous repair had been made, the grouted construction joint at the slab and pilaster junction cracked to the extent of ⅛ of an inch. At the second pilaster, a slight outward movement of the wall, estimated at ¼ to ½ of an inch, was discovered.

Employees of Christopher, who were participating in the construction work, were the first to have knowledge that the blast of August 24 had damaged the retaining wall. Whetsell, employed as a bulldozer operator by Christopher, observed a crack in the retaining wall appear simultaneously with the blast and he described the crack as being vertical and in the area adjacent to what has been described as the first pilaster. Wilson, also employed by Christopher as a machine operater, did not see the retaining

wall crack at the first pilaster contemporaneously with the blast, but he did see a fresh crack a short time after the blast and observed that it ran from top to bottom. He identified the crack from photographs taken for plaintiff the day after August 24. Westfall, a third employee of Christopher, was the man who set off the blast. At the time he detonated the charge, he observed the wall crack at a location he described as being about the middle of the wall between the metal building and the west wall of the main structure.

Immediately after this big blast occurred, Callaham called the office of Christopher and reported what had happened. Shortly thereafter, Christopher's superintendent, Link, came to plaintiff's premises, and then went to the site of the blasting, made some inquiries, and promptly discharged the two men whom he believed to be responsible for the blast. However, he re-employed one of them the same day and the other the following day. Westfall, the man who put off the blast, says that Link admitted having damaged the wall by saying: " * * * we blowed the hell out of Mr. Callaham's wall * * *." As the blasting continued, the crack observed by Whetsell on August 24 widened and Wilson saw two fresh cracks in the wall.

Christopher has detailed records of the hour, number of holes, amount of explosives, and distance covered · for every blast except one. The missing records relate to the most severe blast of all, that occurring in the early afternoon of August 24, 19^0, which Christopher admits was the basis for summarily discharging two employees after complaints of damage came to it from plaintiff immediately after the blast occurred. This particular blast occurred at a point about 325 feet downstream from the center of plaintiff's retaining wall. Nevertheless, Christopher continued its blasting from day to day approaching more closely to plaintiff's property until the blasting reached a point directly opposite plaintiff's property, after which the blasting continued upstream past plaintiff's property. Later the blasting crossed under the Stealey Bridge and over to the same side of the stream as that upon which plaintiff's property is located. In so doing, according to Christopher's records, 54 separate blasts were put off from August 24 to October 6, 1960, and, in addition, there were 6 blasts in the crossing from the main line to a point within 8 or 10 feet from the foot of plaintiff's wall. Christopher continued its blasting until the latter part of November, 1960. One of the blasts which occurred subsequent to that of August 24 resulted in the collapse of some shelves or bins, upon which parts for motor vehicles were stored on the upper floor. These bins were about 8 feet high, 3 to 4 feet long, and 24 inches wide, with a varying number of adjustable shelves in each. With each blast tremors and vibrations were felt within plaintiff's main building and the damage to the wall from the blast of August 24 was aggravated. One of Christopher's employees, who had to pass the wall several times each day, testified that he could see the wall move with each subsequent blast and the crack widen. Not all of the many witnesses can pinpoint the exact date or time of the big blast, but the evidence is conclusive that it occurred on August 24, before 2:00 p. m. The only recorded shot for that day in the Christopher files is for another shot at 5:15 p. m. On February 20, 1961, part of the retaining wall between the two buildings collapsed into the river.

In answer to all of this evidence, Christopher relies primarily on technical scientific evidence. On September 2, 1960, Hammon, a vibration damage specialist came to Clarksburg and measured, with a seismograph, a shot fired about 125 feet from plaintiff's building. He testified that his test showed, for the shot fired, a displacement of .005 inch or about the thickness of a dollar bill, or about the same amount of vibration as would be caused by a person walking on a wooden floor, and that a vibration of this magnitude would not be sufficient to even crack plaster. It was his scientific con-

clusion that the vibrations occasioned by the blasts shown on Christopher's blasting log, at the distances away from plaintiff's building, would have been insufficient to cause any of the alleged damage.

It is significant that he took only one test reading. Instead of ascertaining for himself the amount of explosives in that blast, he took the word of the blaster, who did not testify, for the amount of dynamite used. He did not consider it to be a part of his duties to personally inform himself as to the amount of dynamite used for this simple test, upon which he based his testimony. He was confused as to the amount of dynamite used in this one blast and as to which of three blasts on that day that he tested, explaining that he was in error in his prior report as to both the time of his test and the amount of dynamite. He made no inquiry about the size of the blasts which had previously occurred on August 24 or prior days.

Many property owners residing in the vicinity of the blasts testified as to the severity of the blasts and to damage to their property, which they say was caused by the Christopher blasting, including cracks in concrete floor, asbestos shingles, broken windows, cracks around doors and windows, and in plaster. They were present at the time, knew the condition of their home before and after the blasting and saw the results firsthand. White, a property owner, was working in his yard in the latter part of August, 1500 to 2000 feet away, when he felt the vibration of the earth and saw smoke and haze rising from the blast near the Stealey Bridge and that the blasting damaged his property. The witness, Yerkey, testified that the worst blast occurred the latter part of August, and on that day the window in her kitchen was cracked. Her home was about 1000 feet away from the blasting. Hammon examined many of these properties for defendants months later after they had made claim for damage to their property. He gave it as his expert opinion that he found no damage which was caused by the Christopher blasting.

Defendants also called Cook and Link, vice president and construction superintendent, respectively, of Christopher, and Thrasher, an engineer who visited plaintiff's premises immediately after the blast of August 24. All testified that they had inspected the premises, and although there was evidence of cracks in the building, cracks in the retaining wall, a leaning position of the wall, and cracks in the concrete flooring of the metal building, it was their opinion, from the evidence, that such conditions must have existed many weeks or months prior to the time of their inspections.

■ Now that I have discussed the blasting and the damages claim, I shall return to the first issue which the parties have asked the court to decide: "Did the plaintiff's property sustain damages which were proximately caused or proximately resulted from explosions set off by the defendant, Christopher Construction Co.?" The answer to that question is definitely in the affirmative. On this issue the plaintiff has proved its case by a clear preponderance of the evidence. Most of the damage to plaintiff's property was initiated with the blast of August 24, and further damage resulted from subsequent blasts of which there were 54 closer to plaintiff's premises than that of August 24. During the river crossing there were additional blasts as close as 8 to 10 feet from the foundation wall of plaintiff's main building. Because of the blasts the wall became unstable and finally collapsed into the river on February 20, 1961.

■ There is no dispute between the parties as to the law of West Virginia relating to damages resulting from explosions. The law is clear that where one intentionally sets off a charge of explosives, he is liable for all damages proximately resulting therefrom, irrespective of negligence. Britton v. Harrison Construction Co., 87 F.Supp. 405, D.C.S.D.W.Va.1948, citing Exner v. Sherman Power Construction Co., 2 Cir., 54 F.2d 510, 80 A.L.R. 686. To the same effect, see Fairfax Inn, Inc. v. Sunnyhill Mining Co., 97 F.Supp. 991, D.C.N.D.

W.Va.1951; Whitney v. Ralph Myers Contracting Corp., W.Va., 118 S.E.2d 622, 1961. In the latter case the damage complained of occurred a distance of approximately 1800 feet from the nearest point of blasting operations. Since the law on this point is clear, the parties did not include the question of negligence as an issue in the case.

The only remaining issue relates to the amount of damages proximately caused by the explosions. On this issue I find that the plaintiff has an exaggerated idea as to the condition of its premises prior to the explosions, and to the amount of its damages.

While the main building was damaged by the blasts in many respects as set forth above, it was far from being in perfect condition prior to the blasts. At the request of the parties, the court viewed the premises and could see first-hand the damage resulting from the explosions, as explained in the evidence, as well as cracks, leaks, and other breaks which clearly existed prior to the blasting. For example, there had been some leaks in both the front and rear decks prior to the blasting. It had been repaired on different occasions. In the northwest corner of the basement floor, there was a crack in the wall into which guniting had been placed prior to the blasting. In one place rags had been stuffed into a crack in the north wall of the main building and painted over.

The metal building was in excellent condition before the blasting, as was its floor attached to the wall. There had been no damage to it prior to the blast of August 24, but that blast and the subsequent ones, caused the concrete floor to crack and the foundation wall to move towards the river.

Likewise, before the blasts the asphalt covering the area between the main building and the metal building was free of breaks and cracks. The blasts caused the asphalt to rupture and, eventually, a part thereof followed the wall into the river.

There is also evidence to show that the retaining wall was not in perfect condition prior to the blasting, was not of proper design, that the best and most advisable engineering technique was not used in its construction, that the clay material used for back fill was not the best material to be used and would exert more pressure on the wall than other material. Over the years there had been some outward movement of the wall before the blasting, and it had been patched with guniting. There is a dispute in the evidence as to the adequacy of drainage.

One engineer, Dr. Schaub, who inspected the wall subsequent to the collapse of the retaining wall, concluded that the retaining wall failed as a result of an inherent instability that was due to an improper and poor design, violative of good engineering practice, and that the retaining wall would have failed even if there had been no blasting. Dr. Schaub based his opinion, in part, upon information given him to the effect that there was no footer underneath the wall, as well as the absence of any vertical rods making the wall an integral part of either a footer or rock base. Since he testified, and after the evidence had been closed, the fallen wall has been removed from the river and a new retaining wall has been constructed. When the wall was removed from the river, it was found that there actually was a footer upon which the old wall had been built and that it was still in such sound condition that it was adequate to form the base for the new wall. This footer was used by engineer Riley as the foundation for the new wall. It was also found that there were steel rods or dowels with which the old wall had been tied into the footer. There were about 12 such rods which had been broken off when the wall fell, some of which protruded above the level of the footer to such an extent as to interfere with the workmen and they were cut off. It thus appears that Dr. Schaub based his opinion, in part, upon important factors furnished him by oth-

ers, which now turn out to be erroneous. On motion of plaintiff, the court opened up the evidence to permit this additional evidence to be introduced.

Upon removal of the old wall it was also found that there were two weep holes in the old wall at the level of the footer permitting the draining of water behind the wall, and in the construction of the new wall the same weep holes were used by the engineers. In excavating part of the backfill to provide adequate working space to construct the new wall, it was found for the first time that there were steel rods in the backfill, one end of which extended back into the backfill and the other end of which reached the back of the old wall when it stood upright. There were about 12 of such rods, and the engineer testified that in his opinion they had been parts of deadmen installed when the wall was originally built and that they had broken when the wall fell. At the trial no one knew about any of this information, especially as to the existing footer, and the engineers who testified did not have the benefit thereof in giving their opinion as to the soundness of the wall or the design thereof.

From all the evidence, it is my finding that the main building and retaining wall were old and not in first-class condition. They had been subject to wear and tear, but for many years served the purpose for which they were intended and were still serving such purpose satisfactorily until they were damaged by these blasts. There were some old cracks, but none which made the building or wall unsound or unsafe. Prior to the blasting, the retaining wall had a separation at a cold joint at a pilaster before plaintiff's occupancy and that condition had continued without enlargement or change. It was the only thing which engineer Sampson found to need attention in his examination in 1958, and he took care of that with a deadman installation. It was that part of the wall with which Sampson found nothing wrong that collapsed. Before the blasting began there were no cracks or breaks which affected the struc-tural soundness of the wall or the buildings. The damage related in detail above during and subsequent to the blasting, including the collapse of the wall, was proximately caused by Christopher, and plaintiff has proved such damages by a preponderance of the evidence.

■ Defendants urge that even if the wall was cracked during its operations that the wall did not fall until February 20, 1961, and that because of this lapse of time, it can not be held responsible for the collapse of the wall. There is no merit in this contention. Likewise, there is no merit in defendants' contention that plaintiff has failed to prove the amount of its damage with reasonable certainty under the circumstances.

■■ The parties are also in agreement that the measure of damages in this case is the difference between the fair market value of the property immediately before and immediately after the injury. However, both sides agree that evidence of purchase price, original construction costs, replacement costs, costs of repairs, the purpose for which the property is most adaptable, utility or lack of utility for the purpose for which used, deterioration, reasonable depreciation, rental values, and expert opinions as to fair market value, may be received in evidence to help the trier of fact determine diminution in fair market value. Stenger v. Hope Natural Gas Co., 139 W.Va. 549, 80 S.E.2d 889 (1954).

Here the plaintiff offered the evidence of Corder, a Clarksburg realtor, who gave his opinion as to the fair market value immediately before August 24, 1960, and immediately after it was damaged. Marsteller, an appraiser for a Savings and Loan Association in Clarksburg, calculated replacement cost, less depreciation. Hearn v. McDonald, 69 W.Va. 435, 71 S.E. 568. Riley, a Clarksburg engineer, Clyde Shrum, a general contractor, and Jarvis, a general contractor, all testified as to costs of repair.

In addition to the estimates of the contractors, the plaintiff incurred certain expenses for temporary protection

and repair to the main building and re-taining wall, such as building a sandbag levee, water-proofing of the retaining wall, and erection of a corrugated metal ceiling under the front deck of the main building.

The various figures given for each of these many items will not be enumer-ated. Defendants did not offer any evi-dence relating to fair market value or the costs of repairs, or any other figures as to damages.

Returning now to the second is-sue of fact submitted to me for decision, I find that the sum of $14,000.00 is a fair and reasonable amount to be allowed plaintiff for damages to its property proximately resulting from such explo-sions; that such amount of damages have been proved by plaintiff by a preponder-ance of the evidence, and that plaintiff is entitled to recover that amount from both defendants herein.

The foregoing shall constitute the find-ings of fact and conclusions of law of this court.